UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HOLCIM (US) INC.,

                  Plaintiff,

v.

CARSON INDUSTRIES, INC.,
GREGORY K. PYRTLE, and
PYRTLE VENTURES LLC,

                  Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Holcim (US) Inc. ("Holcim"), for its Complaint against Defendants Carson

Industries, Inc. ("Carson"), Gregory K. Pyrtle ("Pyrtle"), and Pyrtle Ventures LLC ("Pyrtle

Ventures," and collectively with Carson and Pyrtle, the "Defendants"), alleges as follows:

## INTRODUCTION

1.      This action arises from a fraudulent billing and kickback scheme through which

the Defendants defrauded Holcim of substantial sums over multiple years. The scheme arose

from a series of unorthodox "maintenance agreements" between Carson and Holcim, which

Pyrtle – a Holcim employee – signed and approved without authorization. Pyrtle then used these

agreements to have Holcim make automatic monthly payments into a "slush fund" controlled by

Carson, and from which Carson and Pyrtle could pay themselves with no oversight by the proper

managers at Holcim. Over the duration of the maintenance agreements, Holcim paid over $1.2

million into this slush fund.

2.      Carson and Pyrtle abused their unfettered control over Holcim's money to pay themselves for work that was not performed.  Indeed, after terminating Pyrtle and suspending payments under the maintenance agreements, Holcim obtained documents from Carson showing that Pyrtle's own company, Pyrtle Ventures, purported to work as a subcontractor for Carson and received kickback payments from Carson.  Carson and Pyrtle concealed this conflict of interest from Holcim throughout the approximately three-year duration of the maintenance agreements.

3.      Holcim also learned that Carson took nearly $95,000 of Holcim's money to allegedly purchase a "SkyJack" boom lift that was never delivered.  Although Carson, after being exposed, changed its story to claim that the order was cancelled and Holcim's money "refunded," Carson's explanation was rife with inconsistencies. Carson never refunded these monies to Holcim.

4.      Despite Holcim's demands for financial records showing how Carson and Pyrtle used the $1.2 million they collectively received – and despite separate obligations of Pyrtle as well as Carson to provide such records – Pyrtle has refused to produce any records, and Carson has offered to produce them only on vague conditions.

5.      Holcim now brings this suit to recover the damages it knows it has sustained and obtain financial records that Defendants continue to unlawfully withhold from Holcim.  As a result of the Defendants' fraud, violations of the North Carolina Unfair and Deceptive Practices Act, breaches of contract, and other violations of North Carolina law, Holcim seeks compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## PARTIES

6.      Holcim is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Chicago, Illinois.  Holcim is the leading cement

manufacturer in the United States and operates nearly 350 sites distributed across 43 states. Holcim employs approximately 7,000 people in the United States.

7.　　Carson is a corporation organized and existing under the laws of the State of North Carolina with a principal place of business in Pilot Mountain, North Carolina. On information and belief, Carson's business is focused on forklift sales and rentals.

8.　　Pyrtle is an individual residing in Pilot Mountain, North Carolina. Pyrtle was employed by Holcim since at least 2008 through his termination in January, 2023.

9.　　Pyrtle Ventures is a North Carolina limited liability company with a principal place of business in Pilot Mountain, North Carolina. On information and belief, Pyrtle is the Chief Executive Officer of Pyrtle Ventures and at all relevant times owned and controlled Pyrtle Ventures. Pyrtle Ventures also conducts business under the name "Grass, Dirt & Handy Work."

## JURISDICTION AND VENUE

10.　　This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Holcim is a citizen of Delaware and Illinois, and each Defendant is a citizen of North Carolina. The amount in controversy is greater than $75,000.

11.　　This Court has personal jurisdiction over each Defendant because each Defendant resides in North Carolina.

12.　　Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because each Defendant resides in this Court's district and a substantial part of the events giving rise to the claims in this action occurred in this Court's district.

## FACTS

13.     Since at least 2018, Pyrtle was the senior terminal manager at Holcim's cement production terminals in Winston-Salem and Durham, North Carolina.  Pyrtle also managed two Holcim terminals in Nashville, Tennessee.

14.     As a senior manager, he was responsible for determining what goods (including machinery, materials, and supplies) and services his terminals needed to obtain from vendors to maintain operations.

15.     To obtain such goods and services, Pyrtle was required to adhere to Holcim's standard procedures for issuing purchase orders.  These procedures required Pyrtle to, among other things, (1) send requisitions to Holcim's procurement department ("Procurement") for cost review before a purchase order would be issued, (2) obtain approval from the necessary senior managers for contracts exceeding $50,000, and (3) have vendors send invoices to accounts payable for verification before payment would be made.

16.     On information and belief, at all relevant times Pyrtle was aware of these policies and operating procedures.

### A.  Pyrtle and Carson wrongfully evaded Holcim's cost and compliance review to funnel monthly auto-payments to Carson totaling more than $1 million

17.     In early 2019, by intentionally violating Holcim's policies, Carson and Pyrtle acted in concert to create a mechanism by which Holcim would send automatic monthly payments to Carson without any cost or compliance review by Procurement or Holcim's upper management.

18.     The scheme began with the creation of so-called "maintenance agreements" between Carson and Holcim.  The first two of these agreements were dated January 1, 2018, and were for facility maintenance at the Durham and Winston-Salem terminals, respectively (the

4

"2018 Maintenance Agreements").  True and correct copies of the 2018 Maintenance Agreements are attached as **<u>Exhibit A</u>**.[1]

19.     Under the 2018 Maintenance Agreements, Carson was to "provide general maintenance on facility equipment" and hire subcontractors for other unrelated work, such as "electrical, plumbing, mechanical, etc."  Ex. A, p. 1.

20.     Holcim's procurement policies generally prohibit use of subcontractors for regular ongoing services like facility maintenance.  Rather, subcontractors are allowed only for discrete complex projects after proper approval.

21.     The 2018 Comprehensive Maintenance Agreements further provided that:

- Holcim would pay Carson $3000 monthly for each terminal to cover needed maintenance expenses.  If Carson's costs for a particular month exceeded this $3000 amount, Carson would "create and send an invoice for the excess amount."  Ex. A, § 2.1;

- All work would be performed "in a prudent, reasonable, and efficient manner."  *Id*. at § 2.2;

- Carson would send a monthly invoice "for contract repairs to the designated accounts receivable person," irrespective of whether Carson exceeded the monthly baseline amount.  *Id*. at § 4.1;

- Carson would track and share with Holcim "all repairs or modifications" and would "maintain a database using Field Servio and make available all specific reports as it pertains to maintenance history of the related equipment per customer's request."  *Id*. at § 2.1, 2.3; and

- Carson would "monitor and make sure all subcontractors are performing the work properly and within state and county standards."  *Id*. at § 2.1.

22.     Although the 2018 Maintenance Agreements were dated January 1, 2018, the term of the agreements was twelve months starting on December 1, 2018.  Id. at § 5.1.

---

[1] The 2018 Maintenance Agreements reference appendixes.  However, on information and belief, no such appendixes were included with the documents.

5

23.     In order to evade Holcim's review of these non-compliant agreements, Pyrtle intentionally did not send requisitions to Procurement as was required, but rather sent them directly to Holcim's accounts payable department, North American Business Systems (or "NABS"), and initiated the issuance of rarely-used "autopay" purchase orders.

24.     Unlike standard purchase orders, autopay purchase orders result in NABS remitting payments automatically to the vendor every month.

25.     In reliance on Pyrtle's misrepresentations that the purchase orders he sought were allowed under Holcim's policies and had received proper approvals, NABS issued purchase order 4501253252 for maintenance at Durham and purchase order 4501253292 for maintenance at Winston-Salem.  Both of these purchase orders were autopay purchase orders.

26.     Beginning in early January, 2019, and per the purchase orders issued by NABS at Pyrtle's direction, Holcim began wiring Carson monthly payments of $3,292.50 for Durham and $3,270.00 for Winston-Salem.

27.     In early April, 2019, Pyrtle directed NABS to increase the monthly payment amount from $3000 to $5000.  In violation of Holcim's policies, Pyrtle did not seek approval from Procurement or the necessary senior managers for this payment increase.  At Pyrtle's direction, NABS executed the increase, and Holcim began wiring Carson monthly payments of $5,487.50 for Durham and $5,450.00 for Winston-Salem.

28.     In or around September, 2019, Pyrtle again directed NABS to increase the monthly payment amounts.  NABS executed the increase, and in September, Holcim began wiring Carson monthly payments of $9,987.25 for Durham and $9,919.00 for Winston-Salem.

29.     Near the end of the term for the 2018 Maintenance Agreements, Pyrtle and Carson signed two new maintenance agreements, each dated October 1, 2019 (the "2019

Maintenance Agreements"). These agreements contained nearly identical terms to the earlier agreements, except that the monthly payment amount for each facility was $10,000 and the term was for 14 months starting on October 1, 2019. True and correct copies of the 2019 Maintenance Agreements are attached hereto as **Exhibit B**.

30. Like the 2018 Maintenance Agreements, Pyrtle had no authority to sign the 2019 Maintenance Agreements, did not inform Procurement of these agreements, did not obtain necessary approval from his senior managers for these agreements, and sent the agreements only to NABS for payment processing.

31. At Pyrtle's direction, NABS processed Pyrtle's requisition for purchase orders under the 2019 Maintenance Agreements, this time combining payments for both terminals into a single purchase order numbered 4501355050.

32. Starting in December, 2019, Holcim began wiring Carson monthly payments of $10,975.00 for Durham and $10,900.00 for Winston-Salem. In April, 2020, these payments were raised to $12,511.50 for Durham and $12,426.00 for Winston-Salem. Then in August, 2020, on information and belief, at Pyrtle's direction they were slightly lowered to $12,255.00 for Durham and $12,198.00 for Winston-Salem.

33. On information and belief, in or around May, 2021, Pyrtle presented NABS with an unsigned price sheet from Carson listing prices for monthly maintenance for four pieces of mobile equipment (a Linde C114, a Linde C115, a JLG lift, and a SkyJack lift) and also a trackmobile (the "2021 Price Sheet"). The 2021 Price Sheet included language stating that document was "in conjunction with the standard Carson Material Handling Comprehensive Full Maintenance Agreement." A true and correct copy of the 2021 Price Sheet is attached as

**Exhibit C**.  (The 2018 Maintenance Agreements, the 2019 Maintenance Agreements, and the 2021 Price Sheet are referred to collectively as the "Maintenance Agreements.")

34.     On information and belief, Pyrtle used the 2021 Price Sheet as the basis for requesting that the autopay purchase order for facility maintenance be extended and new autopay purchase orders be issued for mobile equipment maintenance and trackmobile maintenance.

35.     In reliance on Pyrtle's representations regarding the 2021 Price Sheet, NABS issued (1) autopay purchase order 4501526573 extending payments for maintenance at the Durham and Winston-Salem terminals, (2) autopay purchase order 4501532531 for trackmobile maintenance, and (3) purchase order 4501532565 for mobile equipment maintenance.

36.     In May, 2021, Holcim began wiring monthly payments under purchase order 4501526573 of $12,255.00 for Durham facility maintenance and $12,198.00 for Winston-Salem facility maintenance.  In June, 2021, Holcim began wiring monthly payments under purchase order 4501532531 of $9,675.00 for trackmobile maintenance, and monthly payments under purchase order 4501532565 of $1,720.00 for mobile equipment maintenance.

37.     The $1,720.00 payments for mobile equipment maintenance were comprised of separate payments of $322.50, $322.50, $537.50, and $537.50, each for the maintenance of a separate piece of machinery.

38.     In January, 2023, Holcim terminated Pyrtle upon discovering his frequent absenteeism from the Durham and Winston-Salem terminals and failure to complete certain safety activities at those terminals.

39.     Following Pyrtle's termination, an internal Holcim audit uncovered the initial evidence of his deceptive and wrongful arrangement with Carson. Holcim consequently suspended payments on the autopay purchase orders with Carson.

8

40.     The total amounts paid to Carson under the respective purchase orders are summarized in the following chart:

| Purchase Order | Date range | Total paid by Holcim | Reportedly for |
|---|---|---|---|
| 4501253252 | 1/3/2019 - 11/20/2019 | $70,569.25 | Durham facility maintenance |
| 4501253292 | 1/3/2019 - 11/20/2019 | $70,087.00 | W-S facility maintenance |
| 4501355050 | 12/20/2019 - 4/20/2021 | $410,418.00 | Durham & W-S facility maintenance |
| 4501526573 | 5/20/2021 - 12/31/2022 | $476,862.00 | Full facility maintenance |
| 4501532531 | 6/3/2021 - 12/1/2022 | $183,825.00 | Trackmobile maintenance |
| 4501532565 | 6/2/2021 - 11/1/2022 | $30,960.00 | Mobile equipment maintenance |
| | **TOTAL PAID :** | **$1,242,721.25** | |

**B.  False invoices created by Carson and Pyrtle reveal their scheme of mutual enrichment was fueled by Pyrtle's self-dealing and Carson's payment of kickbacks to Pyrtle Ventures**

41.     In or around February, 2023, after Holcim suspended payments under the autopay purchase orders, Carson asserted that it was owed $222,831.53 for goods and services it claimed it provided but was not paid for.

42.     In response to Holcim's request for documentation supporting these alleged unpaid obligations, Carson responded by providing invoices and other documents purporting to show amounts it was owed.

43.     The documents Carson provided shed light on the scheme it carried out with Pyrtle and how they colluded to deceive, defraud, and financially damage Holcim.

44.     First, among the documents were twelve sets of paired invoices dated between September and December of 2022, each including an invoice from Pyrtle's company, Pyrtle

9

Ventures, to Carson for work purportedly performed by Pyrtle Ventures as a subcontractor, accompanied by an invoice from Carson to Holcim for that same work, but with the price marked-up 55-60% (the "2022 Pyrtle/Carson Invoice Sets"). True and correct copies of the 2022 Pyrtle/Carson Invoice Sets are attached as **Exhibit D**.

45.     Thus, the 2022 Pyrtle/Carson Invoice Sets revealed that – unbeknownst to Holcim – Pyrtle's own company Pyrtle Ventures was acting as a purported "subcontractor" for Carson under the Maintenance Agreements and receiving kickback payments.

46.     Pyrtle never told Procurement, NABS, or his managers that his own company was working – or purportedly working – as a subcontractor for Carson and being paid from funds under the Maintenance Agreements, which was a flagrant violation of Holcim's policies.

47.     On information and belief, Carson also never raised this inappropriate arrangement with anyone at Holcim (besides Carson's compatriot Pyrtle) during the term of the Maintenance Agreements.

48.     The goods and services Pyrtle Ventures invoiced Carson for, and then Carson invoiced Holcim for, **were never provided to Holcim**.

49.     The following chart summarizes the details of the 2022 Pyrtle/Carson Invoice Sets, including the invoices' descriptions of the goods or services that were, in fact, never provided:

| Inv. Number | Carson Inv. | Pyrtle Inv. | Description |
|---|---|---|---|
| 73042-1 | $11,048.62 | $6,900.00 | Rental of 3 Mini Skid Steers at Winston-Salem ("W-S") *(never provided)* |
| 73516-1 | $4,659.64 | $2,975.00 | Track Loader at W-S *(never provided)* |
| 73649-1 | $13,120.47 | $8,329.84 | "Total Parts" at W-S (Pyrtle Inv. says "ABC Stone") *(never provided)* |
| 74648-1 | $15,014.73 | $9,655.00 | Track Overburden Clearing - Phase 2 at Durham |

10

| | | | |
|---|---|---|---|
| | | | *(not performed by Pyrtle/Carson)* |
| 75018-1 | $5,138.68 | $2,975.00 | New Holland C332 Track Loader rental at W-S *(never provided)* |
| 75413-1 | $15,497.13 | $9,965.20 | Railroad Ballast at Durham *(not provided by Pyrtle/Carson)* |
| 75415-1 | $12,231.40 | $7,865.22 | Track Overburden Clearing - Phase 1 at Durham *(not performed by Pyrtle/Carson)* |
| 75914-1 | $9,091.70 | $5,846.28 | Year-end descaling at Durham *(never performed)* |
| 76154-1 | $7,205.81 | $4,655.29 | Plant maintenance to lights at W-S *(never performed)* |
| 76155-1 | $10,257.35 | $6,595.84 | Plant maintenance to pneumatics at Durham *(never performed)* |
| 76156-1 | $4,470.98 | $2,875.00 | Roof repair at Durham *(never performed)* |
| 76157-1 | $3,691.71 | $2,373.90 | Plant maintenance to buildings at Durham *(never performed)* |
| **TOTAL** | **$111,428.22** | **$71,011.57** | |

50.     The 2022 Pyrtle/Carson Invoice Sets reveal that Carson agreed to kick back to Pyrtle Ventures roughly two-thirds of the amount invoiced to Holcim in exchange for Pyrtle orchestrating automatic monthly payments to Carson.

51.     The 2022 Pyrtle/Carson Invoice Sets represent roughly half of the $222,831.53 Carson still claims it is owed by Holcim.

52.     Carson was not an unwitting conduit in this scheme, but colluded with Pyrtle to intentionally deceive and defraud Holcim.

53.     When confronted about the 2022 Pyrtle/Carson Invoice Sets, Carson's Chief Executive Officer Duane Wilson's attempted defense of his company's actions demonstrated his firsthand knowledge of the scheme.

54.     Specifically, Wilson sought to characterize Carson's 55%+ inflation of the Pyrtle Ventures' invoices as an "industry standard mark-up" by a general contractor on work done and charged by a subcontractor.

55.     However, such a mark-up is far in excess of any industry standard, even when subcontractors are legitimately performing work.

11

56.     Further, Wilson communicated directly with Pyrtle and knew that he was both the manager of the terminals designated on paper to receive the work and also the "subcontractor" invoicing for the work.  Thus, Wilson knew directly of Pyrtle's self-dealing.

57.     Further still, Wilson had actual or constructive knowledge that Pyrtle Ventures had not, in fact, performed the "subcontractor" work represented on its and Carson's invoices.

58.     This scenario – in which a general contractor is inflating invoices submitted by a subcontractor, who itself is controlled by the person purporting to authorize the customer's payment on those invoices – not only defies any rational industry standard, but is blatantly unethical, unfair, and deceptive.

59.     Carson, a well-established commercial enterprise in the field of construction and manufacturing, knew that nothing about its arrangement with Pyrtle was "industry standard."

60.     Moreover, both Carson and Pyrtle each violated their separate obligations to Holcim to maintain and provide records, and they did so in a coordinated manner necessary to conceal their system of wrongful charges and kickbacks.

61.     Carson violated its obligation under the Maintenance Agreements to maintain relevant records and submit invoices to Holcim's accounts payable designee.

62.     Pyrtle violated Holcim's policies requiring disclosure of documents to Procurement for cost and compliance review.

63.     If either Carson or Pyrtle had complied with these obligations, their scheme would have been exposed.

**C. Carson wove a web of deceit concerning a "SkyJack" lift purchased with Holcim funds but never delivered**

64.     In an apparent attempt to explain how some of the auto-paid Holcim funds were used, after Holcim terminated payments under the autopay purchase orders, Carson produced an invoice for a SkyJack boom lift (the "SkyJack") that Holcim had never received before.

65.     The invoice was dated June 20, 2022, and the cost of the SkyJack was $94,940.78 as detailed in Carson Invoice Number 65905-1.  A true and accurate copy of the invoice is attached at **Exhibit E**.

66.     Carson indicated that the SkyJack had been paid for with Holcim funds.

67.     The circumstances surrounding the missing SkyJack indicate that Carson knew the SkyJack would never be delivered and intended to defraud Holcim by keeping the money purportedly allocated to the SkyJack.

68.     Since early 2023, Holcim's managers have been repeatedly asking Carson for the status of the SkyJack.

69.     Wilson has given conflicting answers as to the whereabouts of the SkyJack, saying in March of 2023, for example, that it was "stuck in customs at the Port of Houston."

70.     But Wilson then declined to provide a single record documenting this purchase by Carson – no requisition, bill of lading, receipt, nothing.

71.     After refusing for several months to provide any further information about the SkyJack, in October, 2023, Carson provided documentation, including an alleged credit memo, purporting to show that the SkyJack order was cancelled and that Holcim had already been "refunded" what it had paid.  However, Carson did not, in fact, refund these monies to Holcim. Nor did Holcim receive the alleged credit memo, dated May 8, 2023, and addressed to the Holcim terminal at 308 S Plum Street, Durham, NC.

13

72.    In this October 2023 correspondence Carson's story about the "SkyJack" shifted once again: now the mystery piece of equipment was manufactured by Hered, not SkyJack, and it had been held up in the Port of Savannah, not the Port of Houston.  And while the Carson refund or credit was allegedly issued to Holcim sometime between May and July of 2023, the email from the boom lift dealer explaining why "the factory made the decision to ship the machine back" was dated September 5, 2023.

**D.    Defendants refused to provide records concerning their transactions with Holcim**

73.    By way of letters dated August 14, 2023, to Carson, Pyrtle, and Pyrtle Ventures, Holcim demanded that each Defendant (1) return to Holcim any property in its possession that is properly owed by Holcim, (2) commit to fully disclosing all relevant information relating to the dispute, and (3) begin engaging with Holcim in a good faith settlement process aimed at making Holcim whole, among other reasonable demands for resolution.

74.    Regarding Holcim's demand for relevant information, Carson also had an obligation under the Maintenance Agreements to "maintain a database using Field Servio and make available all specific reports as it pertains to maintenance history of the related equipment per customer's request," and to send monthly invoices for repairs performed under the contracts, which Carson did not do.

75.    Pyrtle also had an obligation as a senior terminal manager to accurately record and report transactions.

76.    As of the date of this Complaint, no Defendant has taken meaningful action to comply with Holcim's demands or made any attempt to resolve the present dispute.

77.    Pyrtle and Pyrtle Ventures have refused to provide any records relating to their transactions with Carson.

78. Carson has only recently expressed a willingness to provide records, but only on the vague condition of not being "falsely accused" in connection with those records.

79. Holcim therefore brings this action both to recover the damages it knows it suffered and to learn the full extent of the wrongdoing and damages that Carson and Pyrtle continue to unlawfully conceal.

## COUNT I – Breach of Contract
### (Against Carson)

80. Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

81. Each Maintenance Agreement was binding contract between Holcim and Carson.

82. Throughout the term of the Maintenance Agreements, Carson was in continual breach of those contracts.

83. Carson materially breached the Maintenance Agreements by the following actions, among others: (1) keeping funds paid by Holcim under the Maintenance Agreements for goods and services that were never provided, (2) using funds paid under the Maintenance Agreements to purportedly buy equipment without proper authorization from Holcim, which was beyond the scope of Carson's contractual rights, (3) failing to provide monthly invoices "for contract repairs to the designated accounts receivable person," (4) failing provide invoices for services performed in excess of Carson's monthly allotments, (5) failing to monitor its subcontractors, including Pyrtle Ventures, to make sure they were performing work properly or at all, (6) failing to perform work "in a prudent, reasonable, and efficient manner," and (7) failing and refusing to track and share with Holcim "all repairs or modifications" and "make available

15

all specific reports as it pertains to maintenance history of the related equipment per customer's request."

84.     As a direct and proximate result of those breaches, Holcim suffered damages and is entitled to compensatory and expectation damages in an amount to be determined at trial.

## COUNT II – Fraud by Omission
### (Against Carson)

85.     Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

86.     Under the Maintenance Agreements orchestrated by Pyrtle and Carson, Carson controlled the funds Holcim dispersed under those agreements, enabling Carson to use those funds to pay itself and the subcontractors it selected.

87.     By failing to provide monthly invoices to Holcim's accounts receivable department or any other payment reports or information to the proper managers at Holcim, Carson had unfettered control over how much it would pay itself for its services and pay its subcontractors – including Pyrtle Ventures – without any oversight by Holcim or reasonable ability of Holcim to learn how those funds were used.

88.     This inequality in knowledge and condition between Holcim and Carson created a relationship in which Carson had a legal duty to be transparent and disclose material information relating to Holcim's funds.

89.     Carson also had an explicit obligation under the Maintenance Agreements to send monthly invoices "for contract repairs to the designated accounts receivable person" and provide other records as detailed above.

16

90. Carson took affirmative steps to conceal material facts by (1) not only breaching its contractual obligations to provide necessary records, but doing so intentionally to conceal its wrongful use of Holcim's funds and Pyrtle's self-dealing, and (2) assisting with the creation of the improper autopay system, both through its role in creating and entering the Maintenance Agreements and by acting in concert with Pyrtle to conceal the system from Procurement and Holcim's senior managers. These affirmative actions by Carson created an additional duty to disclose the omitted material facts.

91. The officers and agents of Carson who had this duty to speak include Carson's CEO Duane Wilson and employee Logan Hoosier, each of whom had firsthand knowledge of Carson's work under the Maintenance Agreements and Pyrtle's self-dealing, and had authority to act on behalf of Carson.

92. On information and belief, on or around June 20, 2022, Carson intentionally concealed the fact that it kept $94,940.78 of Holcim's money that Carson purported to use to buy a "SkyJack" for Holcim.

93. As the basis for the preceding allegation – and as described in greater detail in the allegations above – Carson (1) told Holcim that it had used $94,940.78 of Holcim's money to buy the SkyJack, (2) did not submit an invoice to Holcim for the SkyJack when Carson purported to buy it, but rather did so after Holcim suspended payments under the autopay purchase orders, (3) gave conflicting information about the SkyJack's location, (4) failed and refused to provide accurate information regarding the purchase of this expensive piece of machinery, and (5) claimed to have refunded the purchase price to Holcim when it did not do so.

94. Further, because Carson did not submit an invoice for the SkyJack prior to when Carson purported to buy it, and thus Holcim paid no money to Carson that was earmarked to pay

17

for the SkyJack, the money Carson was purporting to use for the SkyJack must have been taken from money paid under the Maintenance Agreements.

95.     Although Carson asserted in October, 2023, that the SkyJack order was cancelled and that Holcim had already been "refunded" what it had paid, Holcim received neither a refund nor a credit memo from Carson.

96.     Carson's wrongful retention of $94,940.78 was material to Holcim.

97.     In addition to concealing the money it kept for the SkyJack, during the term of the Maintenance Agreements from December 1, 2018, until payments were suspended, Carson also intentionally concealed that (1) Pyrtle Ventures was being paid as Carson's purported subcontractor, which was an egregious conflict of interest, (2) Carson was inflating Pyrtle Ventures' subcontractor invoices by a commercially-unreasonable 55-60%, and (3) Carson knew that neither Pyrtle Ventures nor any other subcontractor was performing actual work for Holcim during sustained periods of time during the terms of the Maintenance Agreements, let alone actual work commensurate with the tens of thousands of dollars in Holcim funds Carson was being paid each month.

98.     The above-described facts were material because they resulted in unfair and commercially unreasonable prices charged to Holcim.  Further, had Holcim known about the omissions, it would have refused payment of the $94,940.78, all unwarranted charges stemming from Pyrtle Ventures' invoices, and further payments for illusory goods and services under the so-called Maintenance Agreements.

99.     Carson's concealment of these material facts was reasonably calculated to deceive Holcim, and done with the intent to deceive Holcim.

100.    Because Carson has refused to unconditionally provide records of Pyrtle

Ventures' work as a subcontractor during the terms of the Maintenance Agreements – which

records Carson has a contractual obligation to provide – Carson is preventing Holcim from

learning details surrounding and the full extent of the improper charges stemming from Carson's

fraudulent concealment.

101.    Carson benefited from its fraudulent omissions by, at minimum, improperly

acquiring $94,940.78 of Holcim's funds, continuing to unfairly inflate Pyrtle Ventures' invoices

under the Maintenance Agreements, and knowingly receiving hundreds of thousands of dollars

for little to no work performed.

102.    Holcim reasonably relied on Carson's omissions because (1) Carson maintained

and controlled all records of work done under the Maintenance Agreements and provided no

such records to Holcim, despite its contractual duty to do so, (2) the only person at Holcim in a

reasonable position to know of the omitted facts was Pyrtle, who was himself receiving kick-

back payments and acting in furtherance of the fraudulent scheme, (3) the material facts omitted

by Carson were not readily discoverable by other means, as the relevant records were maintained

and controlled exclusively by Carson, and (4) Holcim had no reason to suspect that Carson was

omitting these material facts.

103.    Holcim was deceived by Carson's omissions of material facts.

104.    Holcim's reliance on the omissions was detrimental because it paid hundreds of

thousands of dollars under "Maintenance Agreements" for services not provided and goods not

delivered; paid the false "SkyJack" invoice totaling $94,940.78 without receiving the equipment;

and paid unreasonably inflated prices on any limited work that was performed.

19

105. Holcim is entitled to recover its damages in amounts to be proven at trial, including punitive damages.

## COUNT III – Fraud by Omission
### (Against Pyrtle)

106. Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

107. As a terminal manager, Pyrtle was subject to Holcim's policies requiring accurate recording and reporting of transactions and avoiding conflicts of interest, as set forth in Holcim's Code of Business Conduct.

108. Pyrtle was also subject to Holcim's policies and operating procedures for contracting with vendors and seeking the issuance of and payments on purchase orders.

109. By signing the Maintenance Agreements without authority and having purchase orders issued without review by Procurement, and by failing to provide Procurement or his managers information regarding the work Carson was doing under those agreements, Pyrtle created an inequality of knowledge and condition regarding work being done under those agreements.

110. Pyrtle also took affirmative steps to conceal his self-dealing and the improper charges by Pyrtle Ventures by, as described in greater detail above, improperly signing the Maintenance Agreements on behalf of Holcim without authority and improperly sending requisitions to NABS rather than Procurement to create the autopayment system.

111. For the foregoing reasons and allegations incorporated herein, Pyrtle had a duty to disclose to his managers that Pyrtle Ventures was a subcontractor performing work, or was

designated to perform work, under the Maintenance Agreements and details of any work Pyrtle Ventures was performing.

112.    From October through December of 2022, Pyrtle Ventures invoiced Carson for $71,011.57 for work that it never performed, as detailed above. Carson now seeks payment from Holcim of the marked-up price of $111,428.22 based on that fictious work.

113.    Based on statements by Pyrtle in response to Holcim's demand letter, Pyrtle Ventures was working as a subcontractor under the Maintenance Agreements long before October, 2022. However, in defiance of their legal and contractual obligations, Pyrtle and Carson have refused Holcim's demands to provide complete and unconditional access to records of Pyrtle Ventures' work, thereby preventing Holcim of learning the details surrounding the improper charges and full extent of the damages caused by Pyrtle's fraudulent omissions of material fact.

114.    Pyrtle intentionally concealed his self-dealing and that Pyrtle Ventures was billing Carson for work under the Maintenance Agreements that was never performed.

115.    Pyrtle's self-dealing and Pyrtle Ventures' conduct in billing for work it did not perform were facts material to Holcim. Had Holcim known of Pyrtle's self-dealing and improper charges, it would have terminated the Maintenance Agreements and withheld payment on Carson's and Pyrtle Ventures' improper charges, and sought reimbursement for monies paid in exchange for no commensurate goods or services.

116.    By not disclosing these material facts, Pyrtle was able to continue extracting money from Holcim through Pyrtle Ventures' acting as a subcontractor for Carson, including being paid $71,011.57 by Carson for fictitious work since October, 2022, and unknown sums from prior to that time.

21

117.  Pyrtle's concealment was reasonably calculated to deceive Holcim and done with the intent to deceive Holcim.

118.  Holcim reasonably relied on Pyrtle's omissions because (1) it was Pyrtle's responsibility to oversee the work being performed under the Maintenance Agreements, and he did not alert Holcim of his self-dealing or the improper charges, (2) Carson, with Pyrtle's acquiescence, controlled the records of work done under the Maintenance Agreements and provided no such records to Holcim, (3) Pyrtle did not disclose to Holcim his self-dealing in violation of Holcim's Code of Business Conduct and policies requiring fair dealing and transparency, (4) the omitted material facts were not readily discoverable by other means, as the relevant records were maintained and controlled exclusively by Carson with Pyrtle's acquiescence, and (5) Holcim had no reason to suspect that Pyrtle was omitting these material facts.

119.  Holcim was deceived by Pyrtle's omissions of material facts.

120.  Holcim's reliance was detrimental because it enabled Pyrtle to continue making improper charges to Carson, which were further inflated and passed along to Holcim, including amounts that Carson still seeks from Holcim.

121.  Holcim is entitled to recover its damages in an amount to be proven at trial, including punitive damages.


## COUNT IV – Civil Conspiracy to Commit Fraud
### (Against all Defendants)

122.  Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

22

123.    The Defendants agreed and schemed between themselves to avoid Holcim's system of reviewing and auditing vendor contracts and work.

124.    The purpose of the agreement and scheme was to further the unlawful ends of committing fraud upon Holcim by inflating charges and charging for work that was not performed.

125.    The Defendants acted in concert to implement their scheme by, among other actions, entering into the Maintenance Agreements and concealing records relating to the transactions with Carson in violation of their respective obligations.

126.    The Defendants implemented their scheme to injure Holcim by deceiving Holcim to pay for work it did not receive and paying commercially unreasonable prices for work it did receive.

127.    As a result of Carson and Pyrtle's conspiracy to defraud Holcim, Holcim has suffered damages in amounts to be proven at trial.

128.    Holcim is entitled to recover its damages, including punitive damages.

## COUNT V – Violations of the North Carolina
## Unfair and Deceptive Trade Practices Act
### (Against all Defendants)

129.    Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

130.    Carson engaged in unfair and deceptive business practices by (1) intentionally breaching its obligations under the Maintenance Agreements by failing to provide invoices to Holcim with the purpose and effect of concealing improper charges and its improper relationship with Pyrtle and Pyrtle Ventures, (2) acting in concert with Pyrtle and Pyrtle Ventures to receive

23

automatic payments from Holcim in violation of Holcim's policies, (3) billing Holcim for goods and services Carson knew were not provided, (4) unfairly inflating invoices from Pyrtle Ventures by a commercially unreasonable 55-60% and concealing this practice from Holcim, (5) representing that it had purchased a SkyJack for Holcim when in fact it kept that money, (6) intentionally concealing from Holcim the false SkyJack purchase and Pyrtle's self-dealing, and (7) intentionally committing other aggravated breaches of the Maintenance Agreements as described herein.

131. Pyrtle engaged in unfair and deceptive business practices by (1) knowingly violating and circumventing Holcim's policies requiring accurate recording and reporting of transactions and avoiding conflicts of interest, (2) knowingly violating and circumventing Holcim's policies and procedures for issuing purchase orders and for cost and compliance review of work by vendors, (3) fraudulently concealing material facts from Holcim as set forth herein, and (4) acting in concert with Carson and Pyrtle Ventures to issue automatic payments from Holcim to Carson, and from which Pyrtle wrongfully and personally profited.

132. Pyrtle Ventures engaged in unfair and deceptive business practices by (1) invoicing Carson for work that Pyrtle Ventures did not perform, and (2) acting in concert with Carson and Pyrtle to have automatic payments sent from Holcim to Carson, and from which Pyrtle Ventures wrongfully profited.

133. Each Defendant's unfair and deceptive business practices were in connection with the purported sale of goods and services between Holcim, Carson, and Pyrtle Ventures, and were thus in and affecting commerce in North Carolina.

134. Each Defendant's unfair and deceptive business practices were committed knowingly and willfully.

135.    Each Defendant's unfair and deceptive business practices were the direct and proximate cause of damages to Holcim in amounts to be proven at trial.

136.    Each Defendant refused without warrant to resolve this dispute after Holcim's demand to be made whole.

137.    Holcim is therefore entitled to recover treble damages and reasonable attorneys' fees and costs, pursuant to N.C. Gen. Stat. § 75-16 and N.C. Gen. Stat. § 75-16.1, due to the Defendants' willful unfair and deceptive trade practices and unwarranted refusal to resolve this dispute.

138.    Holcim's claims are based on its good faith understanding that the Defendants committed the conduct alleged herein.


## COUNT VI – Breach of Fiduciary Duties
### (Against Pyrtle)

139.    Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

140.    By avoiding Holcim's procedures for cost and compliance review, Pyrtle orchestrated the mechanism whereby he wrongfully gained control over Holcim's payments to Carson for goods and services.

141.    Pyrtle had and exercised domination, control, and influence over these Holcim payment processes arising out of this relationship.

142.    By virtue of this control, Pyrtle owed fiduciary duties to Holcim.

143.    While acting as Holcim's agent, Pyrtle breached his fiduciary duties by failing to act with good faith, fair dealing, and loyalty regarding his self-dealing and misrepresentations.

144.    Pyrtle's breaches caused Holcim damages in amounts to be proven at trial.

25

## COUNT VII – Conversion
### (Against Pyrtle)

145.    Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

146.    During Pyrtle's employment, Holcim issued him a laptop computer on two separate occasions.

147.    After Pyrtle's termination, he returned the newer laptop, but not the older one.

148.    That older laptop likely contains sensitive company data and evidence of the scheme perpetrated by Pyrtle and Carson.

149.    Despite Pyrtle's assertion that he returned the older laptop to Holcim's IT director after a hard drive failure, Holcim has no record of receiving that laptop.

150.    Pyrtle is exercising ownership of the laptop in violation of Holcim's right of ownership, thereby committing conversion and entitling Holcim to damages, including punitive damages.


## COUNT VIII – Negligent Omission of Material Fact
### (Alternative claim against Carson and Pyrtle)

151.    Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

152.    As detailed in Counts II and III, Carson and Pyrtle concealed material facts on which Holcim detrimentally relied.

153.    Pyrtle, as Holcim's employee and agent, owed a duty of care to Holcim when acting in the scope of his employment and agency.

154.     Carson, by entering the Maintenance Agreements and acting as a general contractor controlling Holcim's funds, owed a duty to Holcim to act with reasonable care in performing under those contracts.

155.     Even if Carson or Pyrtle did not intentionally omit material facts and commit the other wrongdoings as alleged herein, they each breached their respective duties of care in negligently omitting those material facts and committing those wrongdoings.

156.     Carson and Pyrtle's negligent omissions of material fact caused Holcim to suffer damages as set forth above and in such greater amounts to be proven at trial.

## COUNT IX – Declaratory Judgment
### (Against Carson)

157.     Holcim repeats and incorporates by reference the allegations of each preceding paragraph as if set forth fully herein.

158.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction… any court of the United States… may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

159.     Carson seeks payment from Holcim for $222,831.53 for work Carson claims it provided, and Holcim denies any obligation to pay that amount because, among other reasons, the underlying charges were (1) not submitted to and approved by Holcim as required under the Maintenance Agreements, (2) for goods or services never received, and (3) for goods or services beyond the scope of the Maintenance Agreements.

160.     An actual and justiciable controversy exists between Holcim and Carson regarding Holcim's obligation to pay the $222,831.53 sought by Carson.

27

161.    Holcim therefore seeks a Declaratory Judgment that it has no obligation to pay that amount.

## PRAYER FOR RELIEF

**WHEREFORE**, Holcim respectfully requests that the Court:

A.  Award a Judgment in Holcim's favor on each Count of this Complaint;

B.  Award Holcim its damages against each Defendant in an amount to be proven at trial, including treble damages as punitive damages for fraud and as provided for under N.C. Gen. Stat. § 75-1.1 *et seq.*, and pre-judgment and post-judgment interest;

C.  Award Holcim its costs and attorneys' fees against each Defendant pursuant to N.C. Gen. Stat. § 75-1.1 *et seq.*;

D.  Award a Declaratory Judgment stating that Holcim has no obligation to pay Carson's outstanding invoices; and

E.  Grant Holcim such other and further relief as the Court deems necessary and just.

## JURY DEMAND

Holcim demands a jury for all claims so triable.

Respectfully submitted,

**HOLCIM (US) INC.,**

Dated: November 21, 2023                      By its attorneys,

/s/ Benjamin B. Tymann
Benjamin B. Tymann*
Massachusetts BBO #652011
**TYMANN, DAVIS & DUFFY, LLP**
One Boston Place, Suite 2600
Boston, MA  02108
617.933.9490
btymann@tddlegal.com
*Appearing pursuant to LR 83.1(d).

28

J. Patrick Yerby*
Massachusetts BBO #664123
**TYMANN, DAVIS & DUFFY, LLP**
One Boston Place, Suite 2600
Boston, MA 02108
617.359.0979
pyerby@tddlegal.com
*Appearing pursuant to LR 83.1(d).


/s/ Joseph H. Nanney, Jr.
Joseph H. Nanney, Jr.
N.C. Bar No. 18355
**MEYNARDIE & NANNEY, PLLC**
101 Glen Lennox Drive, Suite 300
Chapel Hill, NC 27517
joe@mnlaw-nc.com
Telephone: (919) 747-7374
Facsimile: (919) 891-0006